**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**


          -against-                                                    **No. 13 Cr. 00368 (DLC)**


**MAXIM CHUKHAREV,**

                *Defendant.*

-------------------------------------------------------X




## MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT MAXIM CHUKHAREV

Sarah Kunstler
Susan G. Kellman
Ezra Spilke
*Attorneys for Maxim Chukharev*


Law Office of Sarah Kunstler
315 Flatbush Avenue #103
Brooklyn, NY 11217
(718) 783-3682
sarah@kunstlerlaw.net

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

**UNITED STATES OF AMERICA**

          **-against-**                           **No. 13 Cr. 00368 (DLC)**

**MAXIM CHUKHAREV,**

               ***Defendant.***

----------------------------------------------------------X

**MEMORANDUM IN AID OF SENTENCING**
**ON BEHALF OF DEFENDANT MAXIM CHUKHAREV**

**INTRODUCTION**

MAXIM CHUKHAREV now appears before this Court for sentencing following his guilty plea to a conspiracy to operate an unlicensed money transmittal business, in violation of 18 U.S.C. § 1960(b)(1)(B). Mr. Chukharev respectfully requests that the Court accept his representations that he fully and unconditionally accepts responsibility for his conduct. Nothing in this memorandum is intended to detract from his acceptance of responsibility or his unqualified remorse for his wrongdoing.

This memorandum is submitted on behalf of Maxim Chukharev in support of his prayer for a non-Guidelines sentence of time served. We respectfully submit that such a sentence is warranted based on Mr. Chukharev's history and characteristics and the nature and

circumstances of the offense, and is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## THE OFFENSE CONDUCT

On September 23, 2014, Mr. Chukharev entered a guilty plea to Count Two of a three-count indictment, allocuting to his conduct. As Mr. Chukharev told the Court, he began working for Liberty Reserve as an Information Technology Manager in February 2010. Sometime in 2011, Mr. Chukharev learned that Liberty Reserve was operating without a money transmitting license from either Costa Rica or the United States and agreed with others to operate an unlicensed money transmitting business, in violation of U.S. law.

## THE PLEA AGREEMENT

Mr. Chukharev pled guilty to a conspiracy to operate an unlicensed money transmittal business, in violation of Title 18 U.S.C. § 1960(b)(1)(B). This count carries a range of imprisonment from zero to five years. The plea agreement assumes following guideline calculation:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2S1.3(a)(2)) | 34 |
| Minor Role (U.S.S.G. § 3B1.2(b)) | -2 |
| Acceptance of Responsibility: | -3 |
| Adjusted Guidelines offense level | 29 |

While Count Two charges a conspiracy to operate an unlicensed money transmittal business in violation of 18 U.S.C. § 1960(b)(1)(B) (which requires knowledge that the business failed to comply with applicable federal requirements) and 1960(b)(1)(C) (which requires knowledge that the business involved that the business involved "the transportation or

transmission of funds that . . . have been derived from a criminal offense or are intended to be used to promote or support unlawful activity"), the parties agreed that Mr. Chukharev's allocution to a violation of 18 U.S.C. § 1960(b)(1)(B) provided a sufficient basis for his plea of guilty. Consistent with the above, the plea agreement did not include a two-level enhancement pursuant to U.S.S.G. § 2S1.3(b)(1)(A), which applies when a defendant "knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity," as the parties agreed that the scope of Mr. Chukharev's duties with Liberty Reserve and his role in the conspiracy made such an enhancement inapplicable.

Because Mr. Chukharev has no criminal history points, he is placed in Criminal History Category I. Thus, the initial Guidelines calculation is 87 to 108 months' imprisonment. However, because the maximum penalty applicable to Count Two is sixty months' imprisonment, the parties agree that the stipulated Guidelines sentence is sixty months' imprisonment. Under the terms of the agreement, each party is free to present information to the Court relevant to sentencing under 18 U.S.C. § 3553(a).

## THE PRESENTENCE INVESTIGATION REPORT

We have no objections to the Pre-sentence Investigation Report ("PSR").

## THE APPROPRIATE SENTENCE

Section 3553(a) of Title 18 of the United States Code directs a sentencing court to impose a reasonable sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. This statutory mandate has taken on new meaning in light of the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 128 S. Ct. 586 (2007), and *Rita v. United States*, 551 U.S. 338 (2007), as well as the

Second Circuit's decision in *United States v. Crosby*, 307 F.3d 103 (2d Cir. 2005), and its progeny.

In *Gall*, the United States Supreme Court held that while the Guidelines should be "the starting point and the initial benchmark" of a reasonable sentence, the sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 587.  The Supreme Court also "reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id*. Thus, a sentencing court, after considering the advisory Guidelines, is now free to fashion a reasonable sentence that it deems appropriate based upon all of the sentencing factors set forth in 18 U.S.C. § 3553(a).

Further, it is important to recognize that the starting point for the Court's analysis is sixty months, and not the 87- to 108-month range that would have applied were it not for the statutory maximum in this case. Pursuant to U.S.S.G. § 5G1.1(a), in cases such as this one, "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." *See also United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) (holding, pursuant to U.S.S.G. §5G1.1(a), that it was plain error for the district court to treat the initial guidelines calculation of 262 to 327 months as the "benchmark for any variance" when the statutory maximum was 240 months).

Mr. Chukharev is twenty-eight years old and a first time offender. He was arrested in Costa Rica on May 24, 2013, and has been incarcerated for over nineteen months. Born in Uzbekistan in the former Soviet Union, Mr. Chukharev immigrated to Costa Rica with his family

when he was twelve years old. A high school graduate, Mr. Chukharev has worked since the age of sixteen, holding a series of computer and technology jobs and contributing to the support of his family. A father of two young daughters, Mr. Chukharev dreamed of educational and career advancement that would enable him to solidly provide for his parents and children. His involvement in the conspiracy for which he awaits sentence stands in sharp contrast to the positive choices he made in a decade of lawful employment. Mr. Chukharev accepts full responsibility for his criminal conduct and is deeply remorseful for the bad choices he made. We submit that a review of the history and characteristics of this defendant demonstrates that a non-guidelines sentence of time served is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing factors outlined in 18 U.S.C. 3553(a)(1).

1. **The History and Characteristics of the Defendant**

Maxim Chukharev was born in 1986 in Uzbekistan in the former Soviet Union. In 1991, Uzbekistan declared independence from the Soviet Union. While Uzbekistan calls itself a democratic republic, the U.S. Department of State has consistently described the country as an "authoritarian state" marked by widespread human rights abuses and limited civil rights.[1] In their letter to the Court, Maxim's parents, Igor and Dina Chukharev, describe living as victims of "moral and physical oppression" as a Russian minority in a predominantly Muslim country (See Letter from Dina and Igor Chukharev, attached hereto as Exhibit B). Maxim and his younger brother Vadim were often taunted by Muslim boys during the walk to and from school. In 1997, the taunting erupted into violence, and Vadim was badly beaten, receiving several

---

[1]      Dep't of State, 2013 Country Report on Human Rights Practices in Uzbekistan, available at http://1.usa.gov/1DRGuZb.

blows to the head and almost dying from his injuries. (Id.) (See also Letter from Vadim Chukharev, attached hereto as Exhibit C.) The incident was the last straw for Maxim's parents. In 1998, they sold everything they owned and moved with their children to Costa Rica at the invitation of Alexander Potchinski, a cousin of Maxim's mother.

Mr. Potchinski had come to Costa Rica in the 1980s and lived in San Jose with his wife. Mr. Potchinski's two adult children, Oksana and Artem, lived nearby. In the beginning, the Chukharev family slept on the living room floor of Mr. Potchinski's one bedroom house. The Chukharevs loved Costa Rica, where they joined a small but vital Russian community and were free from the daily persecution that characterized their lives in Uzbekistan. However, their joy was tempered by the difficulties they encountered making ends meet, which has been a constant struggle. In Uzbekistan, Dina and Igor were university graduates, with degrees in library science and topography, respectively. In Costa Rica, these degrees did not translate, and the couple's difficulty learning Spanish led to a series of low-skilled and low-wage jobs.

Mr. Potchinski helped the Chukharevs get started, selling Igor a car so that he could begin working as a taxi driver, and hiring Dina as a cashier in a small snack shop he owned. Eventually, the Chukharevs were able to scrape together enough money to rent a house of their own and moved from the Potchinski home to a considerably poorer neighborhood. Igor's job was incredibly dangerous. Once, his car was forcibly taken by carjackers, who removed the engine and abandoned the dismantled vehicle. In his letter to the Court, Mr. Potchinski's son Artem recalls that "Maxim who was only 13, and his father Igor reassembled the car so Igor could go back to work" (See Letter from Artem Potchinski, attached hereto as Exhibit D.)

On a second occasion, when another group of attackers attempted to rob him of his newly restored vehicle, Igor resisted. He was stabbed several times, but managed to save the car. The injuries were not serious, and Igor recovered quickly, but the trauma of these experiences made it impossible for him to continue working as a taxi driver. Igor found odd jobs as a car mechanic, and after Mr. Potchinski closed his snack shop, Dina found a job cleaning rooms at a hotel.  As her language skills improved, Dina was promoted to hotel receptionist and, eventually, to manager of the hotel, which, unfortunately, was forced to close its doors in 2002 due to a drop in tourism after the September 11th attacks.

The year 2002 marked the beginning of a particularly difficult period for the Chukharev family. Unable to find work, they moved with their children to Santa Cruz Guanacaste, a rural farming town approximately six hours north of San Jose. Igor was offered a job as a mechanic at a local garage, and supported the family on a meager salary of about $400/month. Maxim, who was sixteen years old, decided to return to San Jose on his own so that he could work and contribute to the family's support. With his parent's blessing, he left school and went to live with family friends, who gave him a job cleaning rooms at a small hostel they owned. After spending several months earning about $40/month for full time work, without time to attend school, Maxim realized he was being exploited and that would never be able to help his family unless he found a way out.

As a teenager who had immigrated to Costa Rica under his parent's asylum application, Maxim could not yet work legally and did not know to find "off the books" work or a place to live on his own. Fortunately, he met George Olarte and Victoria Lores, a married couple who became Maxim's mentors and surrogate parents, helping him discover his passion for

computers and his life's path. (See Letter from Victoria Lores, attached hereto as Exhibit E.)
George and Victoria, who were in the process of opening a computer sales and repair
business out of their garage, gave Maxim a place to live in their home. When they realized that
Maxim had a talent for repairing electronics, they hired him as their first employee. With their
support, Maxim was able to return to school at night and, after three years, graduated with a
high school diploma at the age of nineteen.

Maxim loved his job with Central de Proveedores Universales ("C.P.U."), the company
that George and Victoria founded. The business was successful, and ultimately grew to include
more than twenty employees and three store locations. At the beginning, he worked part time,
earning approximately $80/month. By the time he left C.P.U., six years later, he was working
sixty to eighty hours per week and was earning approximately $300/month, plus a small
commission on everything he fixed. Maxim was tremendously proud of what he had
accomplished, and the help he was able to provide his parents. (See Letter from Ekaterina
Karavaeva, attached hereto as Exhibit F.)

While at C.P.U., Maxim met and fell in love with Veronica Alvarez Vargas, a fellow
employee of the company. The couple had their first child, ███████ in 2005 when they were
both 19 years old. In 2005, Maxim also briefly attended college at Universidad de Fidelitas in
San Jose. But he was unable to balance his course load with his full time position at C.P.U.
and responsibilities to his family and withdrew from school after six months. In the beginning,
Veronica lived with her parents, but, when ███████ was a year old, the couple moved into
their own apartment together. After five years together, the couple separated in 2009. Maxim, a
devoted and involved father, paid regular child support to Veronica, who had primary custody.

Two years later, in 2011, the couple attempted to reconcile, and a second daughter, ███,
was born in 2012. That same year, Maxim and Veronica decided to end their domestic
partnership, but remain friends and have an amicable co-parenting relationship. Maxim
considers Veronica to be an "amazing mother" and attributes the breakdown of their
relationship to the young age at which they became parents.

In 2007, George Olarte died after a long illness, and C.P.U. went out of business.
Fortunately, around the same time, Maxim received official permanent resident status from the
Costa Rican government and was finally able to work legally. He immediately applied for a job
with Hewlett Packard ("HP"), and was offered a job as a customer support engineer at a salary
of about $1,000/month, more than three times what he made at C.P.U., with a regular forty
hour per week schedule. The job was a dream come true for Maxim. He was able to send
more money to his parents and to afford childcare for ███, which enabled Veronica to
return to school. The shorter hours also enabled Maxim to spend more time with ███
and, for the first time since he began working at age sixteen, to enjoy his life and to look
forward to a future where his parents would not have to struggle.

By 2007, Maxim's parents, Dina and Igor, had become the caretakers of five acres of
land in Garabito in the province of Puntarenas. Originally, the owners of the land, a Russian
couple, wanted to develop it.  But these plans did not materialize, and the owners have used
the property, which is crossed by a river, to mine stones to be sold as construction material.
The couple put Maxim's father in charge of this backbreaking labor. Three months ago, after
the resource was exhausted, the mining business was shuttered, and Maxim's parents
currently have no income. For the time being, the owners of the property have continued to let

the Chukharevs live there, but Maxim's parents are worried about the very real possibility that they will lose their home and have to start over. During this uncertain period, Igor has been taking odd jobs as a mechanic, and he and Dina do a small amount of farming, raising animals and growing food to eat.

Maxim worked at HP for three years, from 2007 to 2010. During that time, there was a wage freeze at the company, and he did not receive a raise in salary. In 2009, he was switched to the graveyard shift, and worked from seven o'clock at night to two o'clock in the morning. With his days free, Maxim took a second job with Grupo Erupeo de Expertos en Seguridad ("G.E.E.S."), a security company that installed security cameras, alarms, and related equipment. He also tried again to return to college, enrolling at the Universidad Interamericana in San Jose to study software engineering. However, as before, he found it impossible to balance his studies with his work and obligations to his family and withdrew shortly after the semester began.

Maxim met Arthur Budovsky in 2009 through his work with G.E.E.S. He was hired to install a security camera for Liberty Reserve. Budovsky was pleased with his work, and later hired Maxim to install a router for Liberty Reserve at a data center in the Netherlands. Maxim took a two-week vacation from his job at HP to do this job, and returned to HP once it was completed. He was impressed by Liberty Reserve, which he perceived as a solid and growing company, and hoped that Budovsky would offer him a full-time job. In 2010, Budovsky offered him a position in the company's Information Technology ("IT") Department with a salary of approximately $1300 per month. By the time of his arrest, in 2013, Maxim was earning approximately $1500 per month.

2.  **The Nature and Circumstances of the Offense**

From February to May 2010, Mr. Chukharev worked full-time for Liberty Reserve in the company's IT Department. From June 2010 until his arrest in the case, Chukharev worked for WEBSA, another company owned by Arthur Budovsky that provided IT services to Liberty Reserve.

When Mr. Chukharev began working for Liberty Reserve, he believed it to be a lawful and legitimate company.  Liberty Reserve had all the trappings of legitimacy. Its offices were in the same office park as Hewlett Packard, Proctor and Gamble, and Western Union. The offices of the Superintendencia General de Entidades Financieras  ("SUGEF"), the Costa Rican financial regulatory agency, were in the building next door. Liberty Reserve had over 50 employees, and included a legal department, human resources, accounting, marketing, a customer care department, and a verification team. Mr. Chukharev was paid a regular weekly salary. He was proud to work at Liberty Reserve and believed that it was a company where he could build a career. Coming from the established corporate culture at HP, Mr. Chukharev imagined a future in which Liberty Reserve was a well-respected international company, a place he would be proud to tell his children and grandchildren that he had helped build.

Initially, Mr. Chukharev's job was to maintain the Liberty Reserve office computer network and repair computers. Ultimately, his job grew to include maintaining the company's servers. The work was overwhelming, far more work than one person could comfortably manage. Mr. Chukharev was continually frustrated by the fact he was never given enough information to adequately do his job.

Sometime in 2011, Mr. Chukharev learned that the company was attempting to get licensed by SUGEF, but as an IT person he did not participate in this process. He knew that Liberty Reserve had encountered some difficulties with licensing and over time, was included in discussions about creating a compliance system that would include a hidden area on the website to hide information from SUGEF. At some point, because of his knowledge of both Russian and Spanish, Mr. Chukharev was asked to assist in translating requests from the Spanish-speaking compliance officer to the Russian-speaking programmers who were developing the system. He also learned that the company was operating in the United States, with many U.S.-based users, and that it did not have a license to do so.

3. **Acceptance of Responsibility and Future Plans**

Maxim Chukharev accepts full responsibility for his illegal conduct.  He understands that by continuing to perform his job at Liberty Reserve, with the knowledge that the company was doing business in the United States without being lawfully registered to do so, he was complicit in a conspiracy to violate U.S. laws.

Mr. Chukharev's acceptance of responsibility and remorse are abundantly evident in his letter to this Court:

> Your Honor, first and foremost, I want you to know how sorry I am for my involvement in this crime against the United States. I am so ashamed, and I also recognize that I have no one to blame but myself for my wrong actions. I would like to apologize to the Court, to the Government and to the people of this country and not least of all to my family. I have let them down in the worst way possible and have left them struggling to deal with the consequences. Over the past 20 months, I have had a lot of time to think about the harm of my actions. My parents, who depended on me, whose names and our family name I have exposed and embarrassed in such an ugly way. My daughters ███████ and ███████ who I cannot hold or provide for, they are getting bigger and bigger every day and learning to live in a world without my participation in their education. My

brother Vadim, who has been left with the responsibility of supporting both our parents and my children, and who has not shown me a moment of anger even though I am to blame for the poverty he lives in and the hard work he must do so that my children have a place to sleep and food to eat. And also my fiancee Stefanie, who has been very supportive all way long and whose love I don't deserve.

(See Letter from Maxim Chukharev, attached as Exhibit A.)

Mr. Chukharev's letter, in which he details his parents' struggles and sacrifices in bringing their children to Costa Rica from Uzbekistan, and acknowledges that his conduct in this case runs counter to everything they taught him, is thoughtful and penitent. It is clear that he is mortified by – and deeply sorry for – his actions. It is also clear that he recognizes that he has no one to blame but himself. "At all times," he writes, "I had options, but I made the wrong choices. I was lucky enough to live in a country where there were opportunities to work hard, to raise my children, and to give back to my parents and show them by living a good life, that their struggles in life had a noble and good purpose. It is very difficult to say but I want you to know that I lost sight of what is important and turned my back on how I was raised." (Id.)

Mr. Chukharev knows he can never repay his family for the enormous sacrifices they have made, and the deprivations they have suffered, as a direct consequence of his criminal conduct. A Russian citizen and a permanent resident of Costa Rica, Mr. Chukharev plan is to return to Costa Rica so that he can devote himself to improving their welfare and circumstances. In the short term, he wants nothing more than to spend time with his children and family, to earn a living, and to resume his role as a provider. In the longer term, his plan is to open a small store fixing televisions and other electronic equipment, and to pursue and fulfill his long-held dream of obtaining a college degree. While, in the past, Mr. Chukharev planned to study computer science or software engineering, his priorities have changed. Mr. Chukharev

dreams of attending the Universidad de la Paz (University for Peace) in San Jose, Costa Rica, and pursuing a degree in civil governance and human rights. His goal is to one day work for a non-governmental organization in Costa Rica focusing on human rights and economic opportunity, and is hopeful that his IT background will be of use.

Mr. Chukharev has already begun working towards this future. While at MDC, through letters, telephone calls and email communication, he has strengthened and maintained ties with his family. He is also pursuing any and all opportunities for education. This past fall, he studied for and passed the GED exam. (See GED Score Report and Transcript, attached hereto as Exhibit R) While he was already a high school graduate in Costa Rica, Mr. Chukharev is committed to beginning his rehabilitation while incarcerated, and enjoys the discipline that studying provides. In addition for preparing himself for his own exam, Mr. Chukharev has been helping other Spanish speaking inmates study for the GED. Two of Mr. Chukharev's students have written letters to the Court. Fredi Gil Rodriguez writes that he and his fellow students "feel very fortunate when we find people like him, who have a spirit of service and do not hesitate to share their knowledge with people that need help"' and Omar Mendez writes that with Mr. Chukharev's help, he has "improved a great deal" on the math portion of the exam, and that he is "grateful to Maxim for all the help he has given me." (See Letters from Omar Méndez and Fredi Gil Rodriguez, attached hereto as Exhibits P and Q, respectively.)

Since passing the GED exam, Mr. Chukharev has continued to study independently. He is learning Mandarin from a textbook sent by his family, and practices conversation with Chinese inmates at the MDC. He is also studying Physics and the programming language for

Arduino, a relatively new open source electronics platform that artists, students and engineers are using to create interactive projects.

4. **Family and Community Support**

Maxim Chukharev is lucky to have the support of his family and community back home; we have received fourteen (14) letters from the people closest to him, to whom he has apologized, and with whom he has shared his remorse. (See Letters from Friends and Family, attached hereto as Exhibits B-O.)

Maxim's family has always stuck together. Indeed, their togetherness has been key to the family's survival during their journey: from leaving Uzbekistan to slowly laying down roots in Costa Rica. People who know the Chukharevs describe a close-knit family. Dr. Olga Alexandrovna Markelova has known the family since 2005, when she performed emergency surgery on Maxim's mother, Diana. (See Letter from Dr. Olga Alexandrovna Markelova, attached hereto as Exhibit G.) She observed a close family getting each other through a challenging time, and notes that "Maxim was always at his mother's side and he also took care of his brother." (Id.)

Anyone who knows Maxim knows that he is a devoted father to his two daughters and misses them painfully. Since Maxim's arrest, his daughters have been cared for by their uncle, Vadim, and their mother Verónica Álvarez.  Vadim, who has a 6th grade education, has been a waiter at a San Jose restaurant called Princess Marina for the past nine years. Vadim writes of Maxim's regret for his actions and "the suffering…that he has caused to all the people that love him." (See Exhibit C.)

A consistent theme in the letters is Maxim's commitment to improving the lives of those around him. As a teenager, Maxim would help teach seniors how to use computers. (See Letter from Marta Khrjanovskyi Rein, attached hereto as Exhibit H.) According to Ms. Rein, Maxim exhibited "great patience and kindness" with the seniors and taught her children computer programming as well. (Id.) At the Sister Cities International Foundation, he volunteered to teach graphic design to young people in the Russian community. (See Letter from Dimitri Ordanski, attached hereto as Exhibit I.)[2]

Maxim makes friends easily. People are drawn to his curiosity and fondness for debate. But they are also are devoted to him because of his loyalty and sacrifice. Catalina Salas Guzmán, an Orthopedic Surgeon and friend of Maxim's, witnessed him spending hours teaching his trade to an unemployed mutual friend, and recalls his "terrific ability to transmit knowledge to others" and his generosity in sharing what he knew.  (See Letter from Catalina Salas Guzmán, attached hereto as Exhibit J.) Ms. Salas marvels at the support that Maxim has always given and others. She writes, "Maxim has always encouraged us to better ourselves professionally; he would remind us of the importance of giving or best efforts to studying and working now that we are young so that we could have a good future."  (Id.) Similarly, Fabricio Pena Gomez, a former co-worker at C.P.U., recalls that Maxim was "always willing to collaborate with and help everyone." (See Letter from Fabricio Pena Gomez, attached hereto as Exhibit K.) And after having been incarcerated at San Sebastian for two months, Maxim took a new arrival under his wing. (Ex. B.) He was a young doctor named Edgar Campos and

---

[2] Maxim volunteered for the Foundation from 2008 to 2012, participating in, among other projects, a dedication to the memory of fallen World War II soldiers. He also maintained the Foundation's website for free. (Id.)

was ill-equipped for life at San Sebastian. When he was released he called Maxim's parents crying out of gratitude. (Id.)

Maxim met his fiancée, Stephanie Marie Jimenez, in 2012. Stefanie has a steady job and is training to become a veterinary assistant. (See Letter from Stefanie Marie Jimenez, attached hereto as Exhibit L.) Stefanie and Maxim provide vital support to each other and hope to be married as soon as Maxim has served his time.  As Ms. Salas puts it, Stefanie is the missing piece in Maxim's "life puzzle." (Ex. J).

### 5.  Mr. Chukharev's Incarceration in the San Sebastian Jail in Costa Rica

Maxim Chukharev was arrested in Costa Rica on May 24, 2014. For ten months, from the time of his arrest in this case in May 2013 until his extradition to the United States in March 2014, Mr. Chukharev was held in the San Sebastian Institutional Penal Center ("San Sebastian") in Costa Rica.

According to the U.S. State Department, harsh prison conditions and treatment rank among Costa Rica's principal human rights abuses.[3] With respect to jail conditions, the Report made the following observations: "Overcrowding, inadequate sanitation, difficulties obtaining medical care, and violence among prisoners remained serious problems in some prison facilities. Security and administrative staffing was insufficient to care for the needs of prisoners, including personal safety." (*See Id*., Section 1(c), "Prison and Detention Center Conditions".) San Sebastian – the jail where Mr. Chukharev awaited extradition – is notorious for its inhumane conditions, even by Costa Rican standards. The State Department's 2013 report

---

[3] Dep't of State, 2013 Human Rights Practices Report for Costa Rica, available at http://1.usa.gov/1Caq7Wy.

made specific mention of conditions at San Sebastian, noting that "1,159 prisoners lived in unsanitary conditions in a facility with a planned capacity of 664". In November 2012, the numbers were reportedly even higher; an article in Costa Rica Hoy reported that the population at San Sebastian had swelled to 1,231 inmates.[4]

Mr. Chukharev's account of his time in San Sebastian evokes a rank chamber of horrors. In Unit A1, Dorm 4, where Mr. Chukharev was housed, there were fifty-seven beds but never fewer than eighty inmates. Inmates slept on thin foam mattresses which were crammed into every available space, including lining the bathroom floors. At San Sebastian, Mr. Chukharev experienced a complete lack of even minimal sanitary conditions. Two toilets and two showers were incapable of meeting the needs of the population. There were no towels, no sheets, and hygiene products like toothpaste and soap were provided sporadically if at all. Cockroaches and rodents ran rampant.   Insufficient quantities of food were provided, and the little food that was served often smelled rotten and induced sickness. Fresh fruit was controlled by a group of inmates who ran the unit, who used it to make alcohol or distributed it as a reward for compliance with their governance. Drugs were everywhere, and crack was smoked openly. The majority of inmates were armed with makeshift knives and clubs made out of rebar, and violent and bloody fights broke out on a weekly basis.

_____

[4] María Siu, "Cárceles se quedan sin espacio para recibir a más presos, hacinamiento en San Sebastián llega a un 85%" [Prisons run out of space for more prisoners, overcrowding in San Sebastian reaches 85%] CR Hoy, Nov. 22, 2012, available at http://www.crhoy.com/carceles-se-quedan-sin-espacio-para-recibir-a-mas-presos-hacinamiento-en-san-sebastian-llega-a-un-85/. (The original Spanish-language version of this article, as well as an English translation, are attached hereto as Exhibit S.)

Recent news reports support both the State Department's findings and Mr. Chukharev's account of his experience. Al Día newspaper gained access to San Sebastian and reported on its inmate's conditions in October 2012, roughly seven months before Mr. Chukharev entered the jail. The report described San Sebastian as a "time bomb" because it suffered from the worst overcrowding in Costa Rica – eighty-five percent versus the national average of thirty-three and one-half percent.[5] The newspaper reported the "unbearable" stench of festering human waste and cockroaches so abundant that inmates would wake up with them walking down their faces. (Id.) One inmate reported that "there is not enough air for everyone." (Id.)

Many courts have recognized the severity of pretrial incarceration, and have highlighted that as an administrative form of detention, it should not rise to the level of punishment. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979). See also *United States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y., 1986) (Weinstein, J.) (noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe.") To temper extreme privations experienced by inmates who have spent long periods of pretrial confinement under deplorable conditions in overseas jails, district courts in the Second Circuit routinely impose reduced sentences. *See e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (recognizing that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"); *U.S. v. Torres*, 2005 WL

---

[5] Nicolás Aguilar R., "La cárcel de San Sebastián es una bomba de tiempo [San Sebastian Jail is a Time Bomb]," Al Día, Oct. 27, 2012, available at http://www.aldia.cr/ad_ee/2012/octubre/27/sucesos3368269.html. (The original Spanish-language version of this article, as well as an English translation and photographs taken of the jail, are attached hereto as Exhibit T.)

2087818 (S.D.N.Y, 2005) (McKenna, J) (departing downward by 1 level "because of the harsh conditions of defendant's pretrial detention while at Combita", a notorious Colombian jail); *United States v. Mateo*, 299 F.Supp.2d 201, 212 (S.D.N.Y.2004) (granting a downward departure for pre-sentence conditions that "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines."); *U.S. v. Francis*, 129 F.Supp.2d 612, 616-19 (S.D.N.Y. 2001) (granting downward departure to defendant who spent thirteen and one-half months in a state facility where defendant was subjected to "substandard conditions"); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996)(three-level departure based on defendant's 22 months of oppressive incarceration); *United States v. Speed-Joyeros, S.A.*, 204 F. Supp 2d 412 (E.D.N.Y. 2002). Post-*Booker*, Courts routinely take egregious pre-trial conditions into account under 18 U.S.C. §3553(a). These reduced sentences typically take the form of non-guidelines sentences. *See e.g. United States v. Behr*, No. S1 03CR1115-02(RWS), 2006 WL 1586563 at *5 (S.D.N.Y. June 9, 2006) (Sweet, J.) (Imposing a non-guidelines sentence of time served on a defendant housed at the Metropolitan Correctional Center based on the 29 months the defendant spent in the "harsh conditions in Unit 11-South at the MCC."); *United States v. Castellanos*, No. 03 CR. 156-08(RWS), 2006 WL 3016313 at *4 (S.D.N.Y.  October 23, 2006) (Sweet, J.) (Taking note, under §3553(a), of the defendant's harsh pre-trial confinement at Combita when imposing a mandatory minimum sentence of 120 months' incarceration.)

Mr. Chukharev's 10-month incarceration at the San Sebastian jail in Costa Rica was nothing short of horrific.  During that time, he lost over forty pounds and became anemic.

When he arrived in the United States, he weighed 122 pounds, a fact that is recorded on his BOP identification. We respectfully ask that the Court take the conditions that Mr. Chukharev endured at the San Sebastian into account when determining the appropriate sentence in this case.

## CONCLUSION

Maxim Chukharev is a first-time offender who worked since the age of 16 to contribute to his family's support. He is a devoted son, father, and partner to his fiancée, with a demonstrated commitment to helping others. His participation in the crime was aberrant, and his role relative to that of his co-defendants, was minor.[6]  After his arrest, he spent 10 months in abysmal and tortuous conditions at the San Sebastian Jail. Mr. Chukharev has already begun his rehabilitation. Further, while at the MDC, he is studying to improve himself and is continuing to help those around him succeed by tutoring fellow inmates.

In consideration of Mr. Chukharev's role, Probation has recommended that the Court impose a non-guidelines sentence of 36 months. At the time of his sentence, Mr. Chukharev will have spent approximately 20 months in prison, the equivalent of a 26-month sentence with the calculation of credit for good time. Given Mr. Chukharev's history and characteristics, we

---

[6] In this regard, it is worth noting that courts, commentators and the Sentencing Commission are recognizing what should be obvious: that not all economic crimes are created equal, and that a defendant's culpability should bear some relation to the gain he has realized from the crime. See e.g., Peter Henning, J., "Elusive Middle Ground in Punishing of White Collar Criminals," New York Times, available at http://nyti.ms/1Cwsp2o, The American Bar Association Report on Behalf of the American Bar Association Criminal Justice Section Task Force Report on the Reform of Federal Sentencing for Economic Crimes, available at http://bit.ly/1sGMaE6

respectfully submit that a non-guidelines sentence of time served is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

Dated:      Brooklyn, New York
            January 16, 2015



                                        Respectfully submitted,


                                        _Sarah Kunstler_


                                        Sarah Kunstler
                                        Susan G. Kellman
                                        Ezra Spilke

                                        *Attorneys for Maxim Chukharev*
                                        315 Flatbush Avenue #103
                                        Brooklyn, New York 11217
                                        (718) 783-3682
                                        sarah@kunstlerlaw.net


cc:     AUSA Christine Magdo
        Emily Frankelis, USPO
        Maxim Chukharev