UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.

MAXIM CHUKHAREV,

        Defendant.

13 Cr. 368-8 (DLC)

## GOVERNMENT SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

SERRIN TURNER
ANDREW D. GOLDSTEIN
CHRISTINE I. MAGDO
KEVIN MOSLEY
Assistant United States Attorneys

- Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 23, 2015

By ECF and Hand Delivery
Hon. Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

  Re: *United States v. Maxim Chukharev,* 13 Cr. 368-8 (DLC)

Dear Judge Cote:

  The Government respectfully submits this sentencing letter in connection with the sentencing scheduled for January 30, 2015, of defendant Maxim Chukharev, who was the information technology manager of Liberty Reserve. On September 23, 2014, Chukharev pled guilty to conspiring to operate a money transmitting business that failed to comply with federal registration requirements in violation of 18 U.S.C. § 1960(b)(1)(B). Pursuant to a plea agreement, the parties have stipulated that Chukharev was a minor participant in the criminal activity. The parties have further agreed that the Sentencing Guidelines call for a sentence at the statutory maximum of 60 months' imprisonment. But for that statutory cap, the parties have stipulated that Chukharev would face a Guidelines range of 87 to 108 months' imprisonment, based principally on the hundreds of millions of dollars that Liberty Reserve transmitted for U.S. customers without a federal license.

## FACTUAL BACKGROUND

  The section below tracks the facts specific to Chukharev as set forth in the Presentence Report ("PSR") prepared by Probation.[1] Furthermore, this section assumes familiarity with the operation of Liberty Reserve, its failure to register as a money transmitting business under federal law, and its use for criminal purposes, as set forth in detail in the Government's sentencing submission in the case of co-defendant Mark Marmilev, dated December 9, 2014 (Docket Entry 120).

  Chukharev met Arthur Budovsky in about 2009, when Chukharev installed security cameras at the Liberty Reserve offices in Costa Rica as part of work he performed while

---

[1] Neither the Government nor Chukharev disputes any of the facts set forth in the PSR.

employed with one of Budovsky's associates.  Budovsky learned that Chukharev had experience with high-end servers and he asked Chukharev to install in the Netherlands network equipment that would be used by Liberty Reserve, which Chukharev did in about March 2009.

In about January 2010, Budovsky called Chukharev and offered him a job at Liberty Reserve.  Chukharev reported to Marmilev – they often collaborated on technical aspects of the Liberty Reserve website – and his duties included managing Liberty Reserve's hardware, and maintaining the office network and computers.  Chukharev also assisted customers with issues they had with the Liberty Reserve shopping cart interface ("SCI").

Chukharev worked on site at the Liberty Reserve offices for about six months, after which time he continued his Liberty Reserve duties, but not as an "official" Liberty Reserve employee.  Instead, Chukharev worked for Liberty Reserve from WEBSA, a Costa Rican company owned by Budovsky that Budovsky had started in order to funnel Liberty Reserve profits to Budovsky in a seemingly legitimate manner.  Budovsky paid Chukharev $1500 per month.

Beginning in the summer of 2010, Budovsky, Marmilev, and Chukharev collaborated on the creation of a system designed to hide information about Liberty Reserve's users and the sources of its business from the Costa Rican regulatory agency known as the Superintendcia General de Entidades Financieras ("SUGEF"),[2] as well as the company's own General Manager Marco Cubero and AML compliance officer Sylvia Lopez.  Chukharev participated in a number of e-mail conversations regarding the creation and implementation of a "Government Administrative Area (GAA)" on Liberty Reserve's computer system, where Cubero and Lopez could view statistics regarding Liberty Reserve accounts and transactions.  Ostensibly, to the extent these statistics contained any suspicious information, Lopez would pass it on to SUGEF.  However, the system was deliberately designed to ensure that Lopez would be given a limited and distorted view into Liberty Reserve's transactional database.

Chukharev was among those receiving e-mails from Marmilev explaining the purpose and function of the GAA.  For example, on June 24, 2010 Marmilev sent an e-mail to, among others, Budovsky and Chukharev.  The document set out the purpose and the function of the GAA.  The GAA would allow the "Costa Rican government [to] view a few statistics," but the "[m]ajority of these statistics are going to be fake."  The data displayed in the GAA would be manipulated by a Hidden Admin (HA) created by Marmilev and the other Liberty Reserve

---

[2] Beginning in 2008 and continuing into 2011, Liberty Reserve made efforts to obtain a money transmitting license from SUGEF. In March 2010, Liberty Reserve hired as its General Manager an experienced and well-respected Costa Rican banker named Marco Cubero, specifically to lobby SUGEF to approve a license for the company.  One of SUGEF's requirements for a money transmitting license was that the company have an anti-money laundering ("AML") compliance officer. Accordingly, in November 2010, Cubero fulfilled that requirement by hiring an experienced Costa Rican banking professional named Sylvia Lopez.  As set forth in more detail in the Government's sentencing submission with respect to Marmilev, despite the hiring of Cubero and Lopez, Budovsky had no intention of implementing an effective AML program at Liberty Reserve.

programmers.  Liberty Reserve would be able to use these systems, once operational, to feed regulators fake statistics concerning the volume of transactions passing through Liberty Reserve and to hide account information for any specific accounts flagged in the HA.  On September 28, 2010, Marmilev sent an e-mail to Budovsky, Chukharev and another co-conspirator with the subject "GAA done," which listed various final updates he made to the GAA, noting that he failed to make a suggested update "in order to not provide an extra figure for sugef to check if the info is correct."

Chukharev had access to the GAA and the HA for development purposes.  In addition, Chukharev was a principal point of contact for Lopez when she had questions about technical aspects of the system's alert functions, and Chukharev assisted in the efforts to prevent Lopez from learning the true nature and scope of Liberty Reserve's business.  For example, in about February 2011, Lopez sent Chukharev a series of e-mails asking technical questions related to her compliance duties, including asking for a list of all exchangers and all users.  Chukharev avoided providing her with this information by replying that another employee of Liberty Reserve (Alan Hidalgo) was working on the exchanger list and that he would request the user list from the programmers but that it would take some time – and he ultimately did not provide the list Lopez requested.  In March of 2011, Cubero resigned from Liberty Reserve, citing in part Liberty Reserve's failure to provide him with adequate reports on Liberty Reserve activity and Budovsky's refusal to allow him any access to the Liberty Reserve database.  Lopez made similar complaints, going as far as to file the equivalent of a suspicious activity report ("SAR") against Liberty Reserve for its lack of adequate anti-money laundering controls.

As Chukharev continued to work for Liberty Reserve, Budovsky gave him more responsibility.  For example, in or about January 2011, Budovsky sent an e-mail to Chukharev, Hidalgo and others indicating that he was placing another person in charge of running WEBSA and implementing Liberty Reserve's system alerts, reports, and monitoring tools.  The alerts, reports, and monitoring tools, as described above, were designed to feign anti-money laundering compliance to the Compliance Officer and General Manager.  Though the e-mail does not mention Chukharev by name, he was the most senior employee at WEBSA other than Budovsky, and he, along with Budovsky were the individuals with access to the WEBSA bank accounts.  Chukharev became the contact person for companies providing goods and services to Liberty Reserve, including companies specializing in server hosting, server management, web design, and credit card processing for Liberty Reserve merchants.

In about January 2012, after Marmilev's computer was searched during a border stop, Budovsky informed Chukharev that Marmilev's computer had been compromised, and he ordered Chukharev to take steps to replace Marmilev in the day-to-day management of Liberty Reserve's technical operations.   Though Marmilev continued to be involved with Liberty Reserve until the website was shut down in May of 2013 – running ExchangeZone and advising Budovsky on Liberty Reserve issues – Chukharev took over several of these duties, keeping the website operating and becoming the point of contact for various technical service providers.

According to a cooperating witness, Chukharev became a trusted member of Budovsky's inner circle.  For example, Chukharev occupied Budovsky's office space at Grupo Lulu, another of Budovsky's companies, and he was one of a few individuals who regularly met with

4

Budovsky to discuss Liberty Reserve issues at the coffee shop where Budovsky held such conversations (in order to physically distance himself from the company's day-to-day operations). Chukharev worked with Budovsky to create websites for offshore companies of the type that Budovsky and others created to facilitate the movement of Liberty Reserve-related funds. Among the companies were two that were set up in Cyprus listing Chukharev as the beneficial owner. Accounts held in the name of these companies contained $3.5 million, and debit cards associated with these accounts were found in Budovsky's possession when Budovsky was arrested. Chukharev contends that he had no contemporaneous knowledge of the purpose of these companies, or knowledge or control over, these accounts, and the Government does not dispute these contentions.

Between 2011 and 2013, Chukharev worked with Budovsky on several Liberty Reserve-related projects, including, but not limited to, the development of a facility to accept credit cards from Liberty Reserve's U.S. users, the placing of key logger software into Liberty Reserve so that Budovsky could monitor the keystrokes of Liberty Reserve employees, assisting with technical issues arising in the operation of ExchangeZone, creating a virtual private network ("VPN") that would allow Budovsky to login to Liberty Reserve accounts from all over the world while appearing to be logging in from Costa Rica, and, in April 2013, travelling to Panama to set up additional offshore companies. According to a cooperating witness, an additional purpose of the trip to Panama was to pay a hosting company to prepare for a possible move of the Liberty Reserve servers to Panama, to prevent seizure by law enforcement.

## DISCUSSION

In Chukharev's case, while the Government recognizes that Chukharev was the least culpable charged defendant in this case, a Guidelines sentence of 60 months would be reasonable in light of the seriousness of the offense in which Chukharev participated. The fact that Liberty Reserve had not registered as a money transmitting business under U.S. law was a vital component of its success as a system used to launder funds derived from or intended to promote criminal activity. While Chukharev may not have been aware of the extensive criminal use of Liberty Reserve, the company's phenomenal success in the criminal underworld was due, in no small measure, to its evasion of U.S. licensing requirements—of which Chukharev admits that he was aware. The operation of a money transmitting business in compliance with U.S. law includes the effective implementation of numerous safeguards designed to detect and deter criminal activity. Particularly here, where the unlicensed money transmitting business at issue transmitted, at a minimum, hundreds of millions of dollars tied to U.S. customers, the anti-money laundering policies underlying Section 1960's enactment were contravened to a far greater degree than in the more typical, smaller-scale Section 1960 case. Though it may not have been Chukharev's direct responsibility to ensure that Liberty Reserve complied with the requirements of Section 1960, Chukharev has shown himself to be a willing participant in deceiving the Costa Rica government in an effort to contravene its AML regulations. His involvement in Liberty Reserve's attempts to deceive SUGEF demonstrate that he was not merely a passive bystander in evading requirements designed to prevent the movement of criminal proceeds.

At the same time, the Government acknowledges the relatively minor role that Chukharev played in the operation of Liberty Reserve, compared to the other charged defendants, including Marmilev. By way of example, beginning in 2003, Marmilev was involved in running a Brooklyn-based digital currency exchanger as an unlicensed money transmitting business, a crime for which Budovsky and Kats were arrested and convicted in 2006. As a result, Marmilev knew that Liberty Reserve was established in Costa Rica in order to evade U.S. law enforcement. Furthermore, Marmilev was aware of—and in fact actively promoted—the illicit use of Liberty Reserve for activities such as "high-yield investment programs" (or "HYIPs") that Marmilev knew to be fraudulent. Furthermore, the Government does not dispute Chukharev's account of his difficult childhood. However, in light of the seriousness of the offense and in particular the harm that Liberty Reserve's continued operation as an unlicensed money transmitting business had on the public, the Government respectfully submits that a Guidelines sentence would be reasonable in this case.

>                        Respectfully submitted,
>
>                        PREET BHARARA
>                        United States Attorney
>
> By:     /s/ Christine Magdo
>                        SERRIN TURNER
>                        ANDREW D. GOLDSTEIN
>                        CHRISTINE I. MAGDO
>                        KEVIN MOSLEY
>                        Assistant United States Attorneys

cc:   Sarah Kunstler, Esq. (by ECF)